LEW WARDEN AND NADJA J. WARDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Warden v. Commissioner
Docket No. 4829-92
United States Tax Court
T.C. Memo 1995-176; 1995 Tax Ct. Memo LEXIS 170; 69 T.C.M. (CCH) 2432; April 17, 1995, Filed *170 Decision will be entered under Rule 155. For petitioners: Lew Warden. For respondent: Debra K. Estrem. RUWE
RUWE
MEMORANDUM FINDINGS OF FACTS AND OPINION RUWE, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Addition to Tax Year
Deficiency
Sec. 6662(b)(2) 1986
$ 1,338
-- 1989
28,344
$ 4,725
After concessions, [1] the primary issue for decision is whether petitioners' yacht-related activities were engaged in for profit within the meaning of section 183. [2] Subsidiary issues are: (1) Whether petitioners properly deferred recognition of a gain pursuant to section 1033; (2) whether petitioners are entitled to offset 1989 income by net operating losses that were allegedly incurred in 1987 and 1988; and (3) whether petitioners are liable for the addition to tax for substantial understatement of income tax pursuant to section 6662(b)(2) for the taxable year 1989. *171 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners resided in Castro Valley, California, when they filed their petition. Beginning in 1953, through the years at issue, petitioner Lew Warden practiced law as a sole proprietor in Alameda County, California. Petitioner Nadja Warden [3] worked in her husband's law office keeping the books, but she received no pay or benefits. She held no other job. Mr. Warden retired from his law practice in 1993. In 1974, petitioners acquired a one-sixth interest in an abandoned tennis and swim club in Pleasanton, California, from Mr. Warden's client, Julius Kahn. The remaining five-sixths of the property was held by Julius and his two brothers. As a result of controversies between the three brothers, the property *172 had fallen into disrepair, and petitioners and Julius planned to reconstruct and operate the property as a recreational facility. Petitioners hoped to retire from the law practice and spend their retirement years working in the "congenial and pleasant surroundings" of a recreational club. Petitioners moved onto the property and, until about 1980, attempted to repair it. However, the property never operated as a tennis and swim club. Around 1980, the Kahn brothers contemplated partitioning the property. Ensuing litigation resulted in a 1980 judgment by the Alameda County Superior Court, which ordered the property sold and the proceeds partitioned between petitioners and the Kahn brothers. The property was sold in 1980 for $ 316,000; petitioners received $ 183,642.15 of the sales proceeds, and the remainder was distributed to the Kahn brothers. In 1981, petitioners appealed from the partition judgment. In 1984, while the appeal was still pending, petitioners filed suit against various parties involved in the partition sale, alleging that the sale was fraudulent. The appeal and lawsuits alleging a fraudulent sale continued until 1989; at that time, all petitioners' claims regarding *173 the Pleasanton property were settled for $ 170,000. Petitioners thus received $ 353,642.15 from the disposition of the Pleasanton property ($ 170,000 plus prior payments of $ 183,642.15). For tax purposes, petitioners assumed that the use of the Pleasanton property was 50 percent business and 50 percent residential, and treated the disposition of the property as having been commenced in 1981 and concluded in 1989. On their 1989 Federal income tax return, petitioners treated the business portion of the gain received from the Pleasanton property ($ 85,000) as "rolled over" into the cost of a yacht they had previously purchased in 1986. In March 1986, petitioners ordered a 1986 Tayana model 55-foot, sailing yacht, with a 120-horsepower, freshwater-cooled diesel engine. It was to be built in Taiwan by Ta Yang Yacht Building Co. and sold through Windships, Inc., of Oakland, California (Windships). Petitioners prepared detailed specifications for the construction of the yacht, which were attached to the purchase agreement with Windships. The name of the yacht was Rocking Chair. Rocking Chair was spacious, nicely equipped, and furnished. It had a saloon, a galley, two bathrooms, *174 and could comfortably sleep ten. It also had a telephone, a microwave oven, a coffeemaker, and a library, which contained periodicals, books, and videotapes. The total cost of Rocking Chair was $ 231,667, which included the cost of accessories and commissioning. Petitioners paid a deposit of $ 46,333 on March 24, 1986. The yacht was delivered to petitioners on December 29, 1986, 6 months later than promised by the seller. Upon delivery, petitioners discovered many defects and failures to complete the yacht according to their specifications. Windships represented that it would correct the defects but did not do so in a timely manner. As a result, petitioners performed much of the work to prepare the yacht for commissioning. After the yacht was commissioned, petitioners continued to experience various equipment failures, including problems with the battery system, autopilot, and refrigerator as well as a transmission failure. Petitioners brought suit in 1989 for breach of contract, breach of warranty, and fraud against Windships, Ta Yang Yacht Building Co., and the owners of Windships. In 1992, petitioners obtained a default judgment from the Superior Court in Alameda *175 County against Windships in the amount of $ 153,164.50 and against Ta Yang Yacht Building Co. in the amount of $ 212,764.50. In 1993, the Superior Court also entered judgment against the owners of Windships, finding them personally liable for the acts of Windships. Mr. Warden was an experienced sailor, who had taken courses in nautical navigation, boat handling, disaster control, and diesel engine maintenance. At the age of 17, he was a seaman on a Swedish oil tanker. He had also been an Air Force navigator and pilot, performing both combat and instructional work. After purchasing their first sailboat in 1947, petitioners engaged in extensive cruising and yacht racing in the San Francisco Bay and offshore. They continued boating for the next 20 years, during which time they purchased and built or rebuilt three sailboats. At the time petitioners purchased Rocking Chair, they were looking forward to enjoying life in somewhat warmer climates than the San Francisco Bay Area presented. Mr. Warden, then age 66, was becoming increasingly dissatisfied with the practice of law and sought to earn a living in a more pleasant recreational setting. The purchase of Rocking Chair *176 was part of his plan for implementing this desire, and as part of his plan, he intended to charter the yacht. At the time petitioners purchased Rocking Chair, they had a net worth of approximately $ 1,027,000. Prior to purchasing Rocking Chair, petitioners had no experience with chartering. Petitioners' preparation for entering the chartering activity consisted of talking with friends, clients, and other acquaintances engaged in chartering activities; going out on a charter boat during a bar association meeting in Jamaica; studying yachting magazines; and talking with people at resorts, such as Club Med. From this, they learned the going rates for different types of charters and decided that the most profitable and least burdensome type of chartering activity would be to conduct day-sailings as opposed to overnight or extended cruises. Petitioners did not prepare a written business plan prior to purchasing Rocking Chair. Although Mr. Warden claimed to be very knowledgeable about the expenses involved in operating and maintaining a yacht, he claimed no such expertise with regard to income from chartering activities. The yacht salesmen at Windships represented to *177 petitioners that they could earn substantial income chartering boats -- about $ 36,000 per season as estimated by the salesmen. Although Mr. Warden was aware, prior to purchasing Rocking Chair, that there was a 55-foot yacht in Windships' marina that was being chartered by Windships, he never discussed the profitability of chartering such a yacht with the owner of the yacht, nor did he check Windships' chartering records to verify the salesmen's statement. He simply concluded from several months of spending time at the harbor and watching the charter boat come and go, that "They were getting charters." Windships informed petitioners of the chartering arrangement between it and the owners of the other 55-foot yacht that it was chartering. This arrangement involved Windships' maintaining the yacht and receiving 60 percent of the charter revenues, leaving the owners only 40 percent of the revenues. Petitioners desired a different type of arrangement, where they would perform most of the labor and maintain insurance on the yacht and receive 60 percent of the revenues rather than 40 percent. Mr. Warden prepared a detailed charter/lease agreement to this effect, which included *178 charter rate schedules; however, the agreement was never signed by Windships. Petitioners did, in fact, perform most of the labor in cleaning and maintaining the yacht and kept a detailed log reflecting the use and maintenance of the yacht. In June 1988, after Rocking Chair's transmission failed, Mr. Warden moved onto the yacht, using it as his residence. On June 10, 1987, petitioners filed a business tax declaration with the city of Oakland in the name of "Rocking Chair Cruises". Petitioners also obtained a seller's permit from the State of California and filed quarterly state, local, and district sales and use tax returns with the State of California, which covered the periods from January 1987 through December 1989. Petitioners obtained an employer identification number in the name of Rocking Chair Cruises from the Internal Revenue Service on June 30, 1987. Using this number, petitioners filed a Form 941 (Employer's Quarterly Federal Tax Return) and remitted the required withholding tax for two employees who worked for them on a few occasions during 1987. These employees helped to clean the yacht and cut and lay carpet for the yacht. Petitioners determined that it was *179 not feasible to continue hiring people for such maintenance work and ceased using employees. Petitioners opened a separate checking account in the name of Rocking Chair and drew checks on this account for expenses relating to Rocking Chair. However, most of the checks that were issued for yacht-related expenses were drawn on Mr. Warden's law practice account or on Mrs. Warden's personal account. Petitioners maintained a telephone on the yacht, the account for which was in the name of Rocking Chair, from April 14, 1987, through July 19, 1989. Petitioners also obtained additional insurance coverage for chartering activities but dropped this additional coverage in 1991. Petitioners obtained a Coast Guard certificate of documentation dated November 19, 1988, for recreation use only. Petitioners made attempts to advertise Rocking Chair for charter. They ran an ad in the classified section of "Latitude 38" during March, April, and May 1988, and they ran an ad in the 1987 Pacific Bell Oakland Yellow Pages. Rocking Chair was only chartered on a few occasions. In 1987, petitioners received three charters through Windships. In 1988, Rocking Chair was not chartered *180 at all. In 1989, Mr. Warden took Rocking Chair south to Santa Barbara, where he listed it for sale with a broker. While there, he met a charter-boat operator who was doing business as Sunset Kidd Sailing Charters (Sunset Kidd). Petitioners obtained three charters through Sunset Kidd in 1989. In 1990, petitioners chartered the yacht once and have not chartered it since. Around 1989 or 1990, Mr. Warden attempted to enter into a working relationship with Mr. Neil Weinberg, who owned a Tayana boat franchise. Mr. Warden anticipated starting a program to sell standardized Tayana boats, using Rocking Chair as a pilot for the program. As part of the proposed sales program, customers would be taken on a cruise to Mexico where they would learn the details and techniques of sailing their new boats. This plan never materialized. Petitioners attempted to sell Rocking Chair after they encountered defects and mechanical problems. Petitioners entered into various agency listing agreements, authorizing the agents to sell Rocking Chair. Petitioners entered five such agreements in all; the first agreement was dated September 7, 1989, [4] and the most recent agreement was dated *181 October 14, 1992. Petitioners ran an ad in "SAIL" magazine for 2 months at the end of 1990 offering the yacht for sale, and they ran an ad in the classified section of "Latitude 38" from June 1991 through January 1992. Petitioners reported large net losses on their Federal income tax returns (Schedule C) attributable to yacht-chartering activities. The following summary reflects the gross income, expenses, and net losses claimed by petitioners with respect to chartering activities: Taxable Year
Gross Income
Expenses**
Net Income (Loss)
1987
$ 2,118
$ 75,712
($ 73,594)
1988 * 5,429
47,536
(  42,107)
1989 * 8,189
75,343
(  67,154)
1990
638
81,876
(  81,238)
1991
153
60,552
(  60,399)
1992
0
45,885
(  45,885)
*In each of the taxable years 1988 and
1989, $ 5,429 represents an amount that
Mr. Warden allocated for his living on
the yacht; it is not charter income.
**These expenses include depreciation claimed
in each of the taxable years
1987 through 1992 of $ 40,225, $ 33,573,
$ 38,139, $ 41,184, $ 40,496, and $ 34,626,
respectively.
*182 During these years, Mr. Warden continued to operate his law practice. The following summary reflects the gross income, expenses, and net income (losses) claimed by petitioners with respect to the law practice: Taxable Year
Gross Income
Expenses Net Income (Loss)
1986
$ 146,027
$ 121,922
$ 24,105
1987
60,119
89,490
(29,371)
1988
163,021
65,297
97,724
1989
92,248
64,249
27,999
1990
63,880
41,278
22,602
1991
108,946
63,781
45,165
1992
4,720
12,939 * 0
*Although reported expenses exceed reported
gross income, indicating that
petitioners incurred an operating loss
in 1992, they reported a net income
(loss) of zero.
Petitioners maintained detailed computer records of the capital expenditures, depreciation, other expenses, and revenues generated by the yacht-related activities. Of 35 pages of records covering the years 1987 through 1990, 33 pages pertain to expenses, while only two pages pertain to income. During the years in issue, petitioners admitted to using Rocking Chair on at least a few occasions for reasons unrelated to their chartering activities. These trips, however, do not appear in their operating log. The only trips *183 that appear in petitioners' log were reflected as charters or as linked to testing or repairing the yacht and its equipment. Petitioners' maintenance log reflects the following trips through 1990: Date
Port/Purpose of Trip
5/24/87
Golden Gate Bridge charter
5/31/87
Guest sail
6/6/87
Guest sail/promotion
6/13/87
Charter
8/14/87
Charter - 2 days.
9/4/87
Depart for Sacramento shakedown cruise.
Anchor at Angel Island.
9/5/87
Leave Angel Island; anchor in Lockport.
9/6/87
Leave Lockport; anchor in Sacramento. Stayed
for 4 days. Depart for home on 9/10/87.
9/19/87
Charity day sailing
1/7/88
Depart for Puerto Rico for Ocean Navigator
Instructional cruise. Stayed for 12 days.
7/2/88
Depart for Delta shakedown cruise. Anchor at
Angel Island.
7/3/88
Leave Angel Island; anchor in Antioch.
7/4/88
Leave Antioch; anchor in Mandeville Cut.
Stayed for 2 days. Depart for home on
7/6/88.
4/29/89
Sail to Sausalito for the purpose of testing
a potential crew member.
7/10/89
Begin trip south. Anchor at Sausalito.
7/11/89
Leave Sausalito; anchor at Half Moon Bay.
7/12/89
Leave Half Moon Bay; anchor at Santa Cruz.
7/13/89
Leave Santa Cruz; anchor at Monterey.
7/14/89
Leave Monterey; anchor at San Simeon. Stayed
for 2 days.
7/16/89
Leave San Simeon; anchor at Pt. San Luis.
Stayed until 9/3/89.
9/3/89
Leave Pt. San Luis; anchor at Santa Barbara.
9/10/89
Sail to Santa Cruz Island for the purpose of
demonstrating yacht, and testing Sunset Kidd
charter boat operator.
9/11/89
Return to Santa Barbara.
10/8/89
Charter - 3 days.
11/7/89
Sail to Marina del Rey to repair water maker.
Returned the next day.
11/20/89
Charter
11/24/89
Charter
12/1/89
Depart for Newport. Anchor at Ventura.
12/3/89
Leave Ventura; anchor at Oxnard.
12/5/89
Leave Oxnard; anchor at Marina del Rey.
12/6/89
Leave Marina del Rey; anchor at Long Beach.
Stayed for almost 1 month.
1/2/90
Leave Long Beach; anchor at Newport. Stayed
for almost 2 months.
2/25/90
Leave Newport; anchor at Dana Point.
2/26/90
Leave Dana Point; anchor at San Diego.
2/28/90
Leave San Diego; anchor at Ensenada, Mexico.
3/1/90
Leave Ensenada. Travelled north, reaching
Ventura again on 3/24/90. Stayed for 4
months.
7/2/90
Move from Ventura to Oxnard to check out
Marina Sailing personnel. Stayed for almost
4 months.
10/28/90
Depart for Santa Barbara.
11/6/90
Leave Santa Barbara; anchor at Santa Cruz.
11/9/90
Leave Santa Cruz; arrive back in San
Francisco.
*184 At the time of trial, Mr. Warden had taken the yacht to Mexico, and Mrs. Warden was planning to move to Mexico to join him. OPINION We must first decide whether petitioners' ownership and operation of Rocking Chair were activities that were "not engaged in for profit" within the meaning of section 183(c). Section 183(a) provides generally that if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed, except as otherwise provided in section 183(b). [5]Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." *185 Deductions are allowed under section 162 for the ordinary and necessary expenses of carrying on an activity which constitutes the taxpayer's trade or business. Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. With respect to either section, however, the taxpayer must demonstrate a profit objective for the activities in order to deduct associated expenses. Jasionowski v. Commissioner, 66 T.C. 312, 320-322 (1976); sec. 1.183-2(a), Income Tax Regs. The profit standards applicable to section 212 are the same as those used in section 162. See Agro Science Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), affg. T.C. Memo. 1989-687; Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Rand v. Commissioner, 34 T.C. 1146, 1149 (1960). *186 Respondent argues that for purposes of section 183, a taxpayer must prove that profit was the primary purpose for engaging in the activity. This case is appealable to the Ninth Circuit Court of Appeals. The primary purpose standard has been followed by the Court of Appeals for the Ninth Circuit in determining whether the requisite profit objective exists. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Polakof v. Commissioner, 820 F.2d 321 (9th Cir. 1987), affg. T.C. Memo. 1985-197; Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d 724 (9th Cir. 1986), affg. T.C. Memo. 1984-472; Carter v. Commissioner, 645 F.2d 784, 786 (9th Cir. 1981), affg. T.C. Memo. 1978-202 (disallowing deductions related to yacht chartering and writing activities under section 183); Hirsch v. Commissioner, 315 F.2d 731 (9th Cir. 1963), affg. T.C. Memo. 1961-256. Whether the *187 required profit objective exists is to be determined on the basis of all the facts and circumstances of each case. Hirsch v. Commissioner, 315 F.2d at 737; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a), Income Tax Regs. While the focus of the test is on the subjective intention of the taxpayer, greater weight is given to the objective facts than to the taxpayer's mere statement of his intent. Independent Elec. Supply, Inc. v. Commissioner, 781 F.2d at 726; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. Petitioners have the burden of proving that they had the requisite intention and that respondent's determination that the activities were not engaged in for profit is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 1.183-2(b), Income Tax Regs., sets forth some relevant *188 factors for determining whether an activity is engaged in for profit. No one factor is controlling. Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Golanty v. Commissioner, 72 T.C. at 426. The relevant factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.
(1) Manner in which the taxpayer carries on the activity. We recognize that there are some manifestations of a business in petitioners' yacht-related activities. Petitioners kept records of the income and *189 expenses and a detailed log reflecting the use and maintenance of the yacht. Petitioners opened a separate checking account in the name of Rocking Chair; however, most of the checks that were issued for yacht-related expenses were drawn on Mr. Warden's law practice account or on Mrs. Warden's personal account. Petitioners also filed a business tax declaration, obtained a seller's permit, filed sales and use tax returns, obtained an employer identification number, obtained additional insurance, and maintained a telephone on the yacht. Petitioners advertised the yacht's availability for charter in the classifieds and the yellow pages; however, attempts to publicize the chartering activities were not significant. Petitioners also attempted to sell the yacht when they encountered defects and mechanical problems. Petitioners did not prepare a written business plan prior to purchasing Rocking Chair. Petitioners relied on representations by the yacht salesmen at Windships that they could expect revenue of about $ 36,000 per season chartering the yacht. Petitioners did not check Windships' chartering records to verify the salesmen's statement, nor did they attempt to determine *190 whether the represented income of $ 36,000 would be sufficient to cover anticipated expenses. Petitioners did not discuss the profitability of chartering with the owner of the other 55-foot yacht that was being chartered by Windships. Although petitioners talked to acquaintances in the chartering business and studied yachting magazines prior to purchasing Rocking Chair, there has been no showing of the specific nature of the information and advice they received from these sources. Even though petitioners kept records of their income and expenses, there has been no showing that they used these records to improve the profitability of the operation. (2) The expertise of the taxpayer or his advisers. Mr. Warden was an experienced sailor, and he had experience maintaining and building yachts. However, petitioners had no experience with chartering. While they claim to have gained knowledge of the chartering business through talking with acquaintances in the business and studying yachting magazines, no reliable evidence exists to show the specific nature of the information and advice that petitioners received from these sources. (3) Time and effort expended by the taxpayer *191 in carrying on the activity. Petitioners spent a good deal of time cleaning and maintaining the yacht; however, these activities are also consistent with use of the yacht for recreation. (4) Expectation that assets used in the activity may appreciate in value. Petitioners argue that they thought the yacht would appreciate in value because of inflation and the declining value of the dollar. Petitioners did not offer any evidence as to their measurement of the yacht's expected appreciation. (5) The success of the taxpayer in carrying on other similar or dissimilar activities. Petitioners have not previously engaged in yacht-chartering activities. (6) The taxpayer's history of income and losses with respect to the activity, and (7) the amount of occasional profits, if any, which are earned. Petitioners' chartering activities generated substantial losses over a period of 6 years, which petitioners used to offset taxable income from other sources. A record of substantial losses over many years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's intention. Cannon v. Commissioner, 949 F.2d 345, 352 (10th Cir. 1991), *192 affg. T.C. Memo. 1990-148; Golanty v. Commissioner, 72 T.C. at 426-427. The presence of such losses in the formative years of a business is not inconsistent with an intent to achieve a later profitable level of operation; however, the goal must be to realize a profit on the entire operation, which presupposes sufficient future net earnings from the activity to recoup the losses. Golanty v. Commissioner, supra at 427. In the present case, petitioners reported losses over 6 years of operation totaling $ 370,377. (8) The financial status of the taxpayer. When petitioners purchased Rocking Chair, their net worth was approximately $ 1,027,000. During the period in which petitioners operated Rocking Chair, they received income from Mr. Warden's law business and other sources, such as interest. While such nonchartering income was not overwhelming, petitioners did obtain a tax benefit from the losses generated by the chartering activities. (9) The presence of elements of personal pleasure or recreation. Mr. Warden was no longer happy in his practice of law, and he was at an *193 age where he was ready to retire. Petitioners wanted to live in a more pleasant, recreational setting. They clearly enjoyed sailing and had engaged in sailing activities for recreation for at least 20 years prior to purchasing Rocking Chair. The yacht was custom built and was equipped with all the amenities. Beginning in 1988, Mr. Warden lived on the yacht and used it as his residence. Petitioners admittedly used Rocking Chair for activities unrelated to chartering but did not document these trips in their operating log. Petitioners' documented trips on Rocking Chair were to locations such as Sacramento, Santa Cruz, Monterey, Santa Barbara, Newport, Ventura, San Diego, and Ensenada, Mexico. Petitioners often stayed for extended periods of time at these locations. Based on a consideration of all the above factors and having heard petitioners' testimony at trial, we believe that they honestly hoped that their yachting activity would generate a profit. Profit was one objective of their activity. However, to prevail, petitioners must show that their yachting activities were engaged in primarily for the purpose of making a profit. Petitioners argue that they would *194 not have purchased Rocking Chair unless their primary objective was to offer it for charter and thereby earn a livelihood. Petitioners argue that due to limited finances, they could not have used Rocking Chair primarily for personal purposes. However, at the time petitioners purchased Rocking Chair, they had an estimated net worth of over $ 1 million, and Mr. Warden was still generating income from the law practice. We cannot overlook the significant recreational elements associated with the yacht. Petitioners loved to sail. They were ready to retire and wanted to live in a pleasant, recreational setting. They did, in fact, travel to many locations. These factors strongly indicate a personal objective. Petitioners contend that the losses sustained as a result of their chartering activities were attributable to unforeseen circumstances, consisting of repeated equipment failures and failures of the seller and manufacturer to correct the yacht's defects. Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not necessarily indicate that the activity was not engaged in for profit. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979); *195 sec. 1.183-2(b)(6), Income Tax Regs. There is evidence that some of petitioners' problems stemmed from mechanical defects. However, petitioners failed to conduct the type of preliminary investigations that one would expect from someone who was motivated primarily by a profit objective. Further inquiry might have given petitioners insight into the likelihood of many of the problems they encountered. See Thomas v. Commissioner, 84 T.C. 1244, 1278 (1985), affd. 792 F.2d 1256 (4th Cir. 1986). Where taxpayers have both personal and profit objectives for engaging in an activity, it is our task to determine which was "primary". Based on the entire record, we are not convinced that petitioners' primary objective was to make a profit. See Snyder v. United States, 674 F.2d 1359, 1362-1364 (10th Cir. 1982). Rather, the evidence is more consistent with the conclusion that petitioners wished to retire from the practice of law, had a desire to sail, had the financial resources to pursue that desire, and had some hope that they could combine their dream retirement with an income-producing venture. Based *196 on this record, we simply do not believe that petitioners' profit objective was the primary or dominant reason for engaging in the activity in question. We hold that petitioners' yacht-related activities were not engaged in for profit within the meaning of section 183(c). Petitioners' deduction of the loss associated with these activities is, therefore, subject to the limitations set forth in section 183(b). Respondent disallowed the entire loss that petitioners claimed in 1989 regarding the yacht. As noted previously, section 183(b)(1) permits a deduction for expenses that are otherwise deductible without regard to profit objective, such as interest and taxes. Included in petitioners' claimed loss was an interest expense deduction of $ 15,782 and a tax deduction of $ 3,908. Respondent makes no claim that these amounts were not paid. Rather, respondent's position in both the notice of deficiency and on brief is that petitioners were not engaged in the chartering activity for a profit. Petitioners are, therefore, entitled to deduct these items pursuant to section 183(b)(1). [6] Because these deductions exceed the total gross income reported from the activity (i.e., $ 8,189), *197 petitioners are not allowed any deduction pursuant to section 183(b)(2). Next, we must determine whether petitioners may defer recognition of the gain on the disposition of the Pleasanton property pursuant to section 1033. Section 1033(a) provides that if property is compulsorily or involuntarily converted "as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof", then the gain from the conversion shall not be recognized, provided the converted *198 property is replaced by property that is "similar or related in service or use" within a specified time period. Whether replacement property is similar or related in service or use depends upon whether the taxpayer's use of the replacement property is similar to his use of the original property. Filippini v. United States, 318 F.2d 841, 844 (9th Cir. 1963); Wheeler v. Commissioner, 58 T.C. 459, 463 (1972). Petitioners have conceded that if we find that their yacht-related activities do not constitute a trade or business, they are not entitled to roll over the business portion of the gain from the Pleasanton property into the cost of Rocking Chair. Accordingly, we uphold respondent's determination on this issue. [7]
*199 Alternatively, petitioners contend that pursuant to section 172(b)(1)(B), they are entitled to carry forward certain net operating losses from taxable years 1987 and 1988 to offset any taxable income for 1989. Petitioners argue that the net operating losses would fully absorb any income required to be recognized for 1989. Petitioners did not claim any net operating loss carryover on their 1989 Federal income tax return; this issue was first raised in the petition. Petitioners bear the burden of proving that they are entitled to a net operating loss carryover. Rule 142(a). Other than their 1987 and 1988 returns, petitioners have offered no evidence that they sustained losses in these years. [8] *200 An entry on a tax return does not prove the existence of losses. Halle v. Commissioner, 7 T.C. 245 (1946), affd. 175 F.2d 500 (2d Cir. 1949); Klukwan, Inc. v. Commissioner, T.C. Memo. 1994-402. Therefore, petitioners have not met their burden of proof on this issue. [9]
Respondent determined that petitioners are liable for the addition to tax under section 6662(b)(2) for the taxable year 1989. Section 6662, which is applicable to returns due after December 31, 1989, imposes an addition to tax in an amount equal to 20 percent of the portion of any underpayment attributable to a substantial understatement of income tax. Sec. 6662(a), (b)(2). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. Sec. 6662(d)(1)(A). Petitioners bear the burden of proving that respondent's determination of an addition to tax is erroneous. Rule 142(a). Petitioners presented no evidence to rebut respondent's determination, and they made no argument on brief separately challenging their liability for the section 6662(b)(2) addition to tax for the taxable *201 year 1989. Accordingly, respondent's determination is sustained. Decision will be entered under Rule 155. Footnotes
1. At trial, petitioners conceded the deficiency determination for the taxable year 1986.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Hereinafter, petitioners will be referred to as Mr. Warden or Mrs. Warden where necessary for clarification.↩
4. Although the evidence contains a central agency listing agreement that petitioners purportedly entered into with Gary Helms on Oct. 1, 1988, the agreement is not signed.↩
5. Sec. 183(b)(1) permits a deduction for expenses that are otherwise deductible without regard to whether or not the activity is engaged in for profit, such as interest and personal property taxes. Sec. 183(b)(2) permits a deduction for expenses that would be deductible only if the activity were engaged in for profit, but only to the extent of the total gross income derived from the activity less deductions allowed by sec. 183(b)(1)↩.
6. Respondent disallowed the entire loss, or the difference between the gross income and the total expenses, claimed by petitioners with regard to yacht-chartering activities. Because this calculation subtracts out an amount equal to the gross income from the activity, petitioners have already been allowed a "deduction" of $ 8,189. Therefore, petitioners' total expenses of $ 19,690 for interest and taxes must be reduced by the $ 8,189 already taken into account, leaving an allowable deduction of $ 11,501.↩
7. Even if the replacement property were similar or related in service or use, there has been no involuntary conversion of the Pleasanton property within the meaning of sec. 1033. Petitioners contend that the court-ordered sale of the Pleasanton property, which petitioners challenged on appeal and later alleged to be fraudulent, constituted a theft or seizure of their property within the meaning of sec. 1033(a). There has been no prior adjudication or admission of fraud, and petitioners have presented no evidence that the court-ordered sale was fraudulent or constituted theft as that term is used in the Internal Revenue Code. See Hope v. Commissioner, 55 T.C. 1020, 1034-1035 (1971), affd. 471 F.2d 738↩ (3d Cir. 1973).
8. We note that petitioners' reported net operating losses from the taxable years 1987 and 1988 arose in large part from the losses from their yacht-chartering activities.↩
9. Even had petitioners met their burden of proving the existence of net operating losses, they have not shown that they made a proper election to relinquish the 3-year carryback period, such that they would be entitled to carry any net operating losses forward. Sec. 172(b)(3)(C).↩