T.C. Memo. 1997-553

UNITED STATES TAX COURT

RODNEY W. TARAS AND LINDA K. TARAS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12177-93.                    Filed December 18, 1997.

<u>Marc S. Fisher</u>, for petitioners.

<u>Michael D. Baker</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and additions to tax as
follows:

|  |  | Addition to Tax |
| Year | Deficiency | Sec. 6651(a)(1) |
| 1987 | $8,053.15 | $1,873.11 |
| 1988 | 8,904.00 | 2,192.75 |
| 1989 | 6,269.00 | 1,572.00 |
| 1990 | 8,970.00 | 2,300.42 |

After concessions,[1] the issues remaining for decision are: (1) Whether petitioners' horse racing and breeding activity during 1987, 1988, 1989, and 1990 was an activity "not engaged in for profit" within the meaning of section 183; and (2) whether petitioners are liable for additions to tax pursuant to section 6651.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and second stipulation of facts are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Walnutport, Pennsylvania.

During the years at issue, Ms. Taras was employed as a full-time secretary in the accounting department at Bethlehem Steel Corp. (Bethlehem). Ms. Taras worked 40 hours per week at Bethlehem. On their 1987, 1988, 1989, and 1990 Federal joint income tax returns, petitioners reported gross income from Bethlehem in the amounts of $26,690, $27,458, $29,576, and $31,804, respectively.

---

[1]Petitioners concede that the notice of deficiency for 1987 improperly allowed a gambling loss deduction in the amount of $3,701, thereby erroneously reducing taxable income by $3,701.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

During the years 1980 through 1995, Mr. Taras owned and operated a framing and truss fabrication business in Walnutport, Pennsylvania. As a framing contractor, Mr. Taras employed and supervised as many as 5 to 10 employees whose primary function was to frame houses and fabricate trusses. On Schedule C, Profit or (Loss) From Business or Profession, petitioners reported net income of $33,283, $32,261, $25,517, and $38,926 from the framing and truss fabrication business for 1987, 1988, 1989, and 1990, respectively.

Mr. Taras grew up on his family's farm. During those years, the family farm had horses as did other farms on which Mr. Taras worked when he was a teenager. In 1980, petitioners lived on a 1-acre parcel of land that is adjacent to a 2-acre parcel owned by Mr. Taras' parents. Petitioners kept their horses on the 2-acre parcel during the years at issue.

Prior to 1980, petitioners made plans to begin racing and breeding horses. Petitioners did not have any experience in racing or breeding horses. Petitioners' plan generally consisted of a desire to purchase racehorses, race those horses, and thereafter to breed their horses in an effort to eventually race the horses they bred. In the summer of 1979, petitioners contacted Ms. Audrey Kraynik, who represented that she was the only female licensed horse trainer in Pennsylvania and that she had trained horses for a number of years. Petitioners did not consult with anyone other than Ms. Kraynik and her two personal

references before they started their horse racing activity.  Upon the recommendation of Ms. Kraynik, petitioners purchased a horse named Stand Away in 1979 and seven horses in 1980 named Dublin Bay, Captain's K, Liberty Knoll, Bad Memories, Naughty Castle, Distinctive Jet, and Talitha.  All these horses, with the possible exception of Distinctive Jet, were purchased by petitioners for a total original investment of approximately $65,000.

In 1983, petitioners and Ms. Kraynik became involved in a dispute over the ownership of Distinctive Jet, which was eventually resolved in 1987.  As a result of the dispute, petitioners lost any ownership rights in Distinctive Jet and, therefore, were unable to register any of the foals of Distinctive Jet or use them for racing or breeding purposes.

In 1980 and 1981, while petitioners were operating their horse racing activity, a number of their horses were injured. Liberty Knoll broke a bone in her leg and subsequently died; Talitha suffered cuts from jumping out of a trailer while being transported; Bad Memories suffered bone chips in her knee; Captain's K developed tendon problems; and Naughty Castle suffered injuries to her leg and foot.  Petitioners had purchased Liberty Knoll for $11,000, Talitha for $2,500, Bad Memories for $5,000, Captain's K for $10,000, and Naughty Castle for $10,500. Several of petitioners' other horses suffered injuries as well. In 1983, Ruth Ann K suffered internal lacerations while giving

birth; in 1994 or 1995, Traders K suffered internal injuries related to complications with an unborn foal; and Tekla Tekla Two and Captain Konik developed leg and knee problems.

Sometime in 1981, in an effort to obtain information on breeding race horses, Mr. Taras contacted Mr. Tom Regal and Mr. Paul Mills, who each had experience in breeding horses. Mr. Regal and Mr. Mills both owned ranches in Pennsylvania, where each had his own breeding operation. Petitioners also joined the Pennsylvania Breeders Association and began subscribing to magazines and publications regarding the breeding of horses.

Petitioners hired a number of professionals to assist them in training, boarding, and caring for their horses. Petitioners hired licensed trainers including: Ms. Audrey Kraynik, who trained petitioners' horses between 1980 and 1981; Mr. Keith Lebaron, who trained their horses in 1982, 1983, 1985, 1989, and 1990; Mr. William Summers, who trained their horses for a brief period of time; Mr. Leslie Vegh, who trained their horses in 1991 and 1992; and Mr. Rusty Albright, who trained petitioners' horses from 1993 to the time of trial. These trainers also fed and cared for petitioners' horses during the period they trained them. Petitioners also hired veterinarians to care for their horses.

Petitioners each spent time working on their horse racing and breeding activity. Mr. Taras made improvements to the

adjacent property, including a small barn and seven stalls, and enclosed the area with fencing. Later, a 20-stall barn was built. In an effort to reduce expenses during the years at issue, petitioners increased the number of hours each spent working on their horse activity. They performed simple veterinary tasks such as worming the horses and giving them shots. Petitioners began buying veterinary supplies from different catalogs rather than tack shops and boarding their horses on the adjacent 2-acre parcel when they were not racing. Also during the years at issue, petitioners eliminated their farm help and performed by themselves such activities as cleaning the stalls and feeding and grooming the horses.

Ms. Taras maintained the books and records of petitioners' horse racing and breeding activity. Petitioners offered a detailed summary of expenses associated with their activity, which included monthly expenses for feed, veterinarians, trailering, jockey club fees, tack, boarding, farriery, breaking, training, stud services, legal fees associated with the activity, and other miscellaneous items. Ms. Taras also kept a summary of the dates they acquired their horses, the purchase prices, and the proceeds received if a horse were sold.[3] These records also

---

[3]The following is a list of the horses purchased and the calculation of gain or loss on each horse:

(continued...)

describe whether the horses were used for breeding or racing and the amount of their winnings, if any. Petitioners records indicate that the income and expenses related to their horse activity over the years from 1980 to 1995 resulted in gross income of $76,648, expenses of $541,782, and a net loss of $465,134.[4] From time to time, petitioners used the books and

---

[3](...continued)

| Horse's Name | Year Purchased | Purchase Price | Sale Proceeds | Gain/loss |
|---|---|---|---|---|
| Dublin Bay | 1980 | $6,500 | $500 | ($6,000) |
| Captain's K | 1980 | 10,000 | -0- | (10,000) |
| Liberty Knoll | 1980 | 11,000 | -0- | (11,000) |
| Bad Memories | 1980 | 5,000 | -0- | (5,000) |
| Naughty Castle | 1980 | 10,500 | 110 | (10,390) |
| Distinctive Jet | 1980 | 2,500 | -0- | (2,500) |
| Talitha | 1980 | 2,500 | 380 | (2,120) |
| Royale Finale | 1981 | 900 | -0- | (900) |
| Hermit's Glory | 1981 | 1,637 | -0- | (1,637) |
| Fab's Last | 1981 | 1,637 | 600 | (1,037) |
| Ruth Ann K | 1982 | 1,000 | -0- | (1,000) |
| Kings Linn | 1983 | 5,000 | 3,200 | (1,800) |
| Anda | 1983 | 2,500 | 300 | (2,200) |
| Kashmir | 1983 | -0- | -0- | -0- |
| Thaddius | 1983 | -0- | 500 | 500 |
| Snickers | 1983 | -0- | 200 | 200 |
| Tamara | 1983 | -0- | 315 | 315 |
| Scoundrel | 1984 | -0- | 260 | 260 |
| Filly | unknown | -0- | 440 | 440 |
| Colt | unknown | -0- | 140 | 140 |
| 2 fillies | unknown | -0- | 290 | 290 |
| Dublin Bay's colt | 1986 | -0- | 425 | 425 |
| Anda's colt | 1987 | -0- | 300 | 300 |
| 2 colts | 1988 | -0- | 1,000 | 1,000 |
| Apple Writer | 1990 | 2,000 | 500 | (1,500) |
| Total | | $62,674 | $9,460 | ($53,214) |

[4]See appendix.

records to determine what, if any, income and expenses they had in connection with their horse activity.

Petitioners also maintained records on the breeding of each of their horses. Beginning in 1982, petitioners bred the horses they purchased. Later, during 1991 and 1992, petitioners bred their mares Traders K, Angular Pleasure, Bad Memories, and Its Legit to the stallion Tagish for a stud fee of $2,000 each. During 1993, petitioners bred their mares Its Legit and Angular Pleasure to the stallion Deerhound for a stud fee of $2,500 each. Angular Pleasure was again bred to Deerhound in 1994 for a stud fee of $3,000. Finally, petitioners bred their mares Traders K and Tekla Tekla Two to the stallion Norquestor for a stud fee of $3,500 each.

As a result of petitioners' having bred their mares to the above-mentioned stallions, a number of foals have been produced. By breeding their mares to Norquestor, petitioners had produced, at the time of trial, one horse of racing age and two yearlings. Petitioners estimate an average value of $15,000 for each of their foals bred from Norquestor.

The property upon which petitioners maintained their horse operations and their horses was not open to the public. Petitioners did not ride the horses themselves nor allow others, except for professional trainers, to ride their horses.

Petitioners attended horseraces, watched their horses race, and gambled on horses at various times.

During the years at issue, petitioners filed their tax returns after the due date for each year. Petitioners filed their tax returns for the tax years 1987, 1988, and 1989 on August 23, 1991, and their tax return for the tax year 1990 on June 19, 1992. On March 15, 1993, respondent mailed petitioners a notice of deficiency for each of the taxable years 1987, 1988, 1989, and 1990.

## OPINION

The first issue we must decide is whether petitioners' horse racing and breeding operation was an activity "not engaged in for profit" as defined in section 183. Section 183(a) provides generally that no deduction attributable to an activity which is not engaged in for profit is allowed except as provided in section 183(b). Section 183(b)(1) allows those deductions which are otherwise allowable regardless of profit objective. Section 183(b)(2) allows those deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income attributable to the activity exceeds the deductions permitted by section 183(b)(1). Section 183(c) defines "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowed under section 162 for the ordinary and necessary expenses of carrying on an activity which constitutes the taxpayer's trade or business. Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. With respect to either section, the taxpayer must demonstrate a profit objective for the activities in order to deduct associated expenses. See Agro Science Co. v. Commissioner, 934 F.2d 573, 576 (5th Cir. 1991), affg. T.C. Memo. 1989-687; Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir. 1990), affg. 91 T.C. 686 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Jasionowski v. Commissioner, 66 T.C. 312, 320-322 (1976); Rand v. Commissioner, 34 T.C. 1146, 1149 (1960); sec. 1.183-2(a), Income Tax Regs. While a reasonable expectation of profit is not required, a taxpayer's profit motive must be bona fide. Simon v. Commissioner, 830 F.2d 499, 500 (3d Cir. 1987), affg. T.C. Memo. 1986-156.

Respondent argues that for purposes of section 183, a taxpayer must prove that profit was the primary purpose for engaging in the activity. In Simon v. Commissioner, supra at 500, the Court of Appeals for the Third Circuit, the court to which this case is appealable, stated:

It is well established that in order to take a deduction for expenses incurred in carrying out a trade or business the taxpayer must have entered into the venture with the primary and predominant purpose and objective of making a profit. See Thomas v. Commissioner, 792 F.2d 1256, 1259 (4th Cir. 1986); Tallal v. Commissioner, 778 F.2d 275, 276 (5th Cir. 1985). "Primary" in this context means "of first importance" or "principally", while "profit" means economic profit independent of tax savings. Malat v. Riddell, 383 U.S. 569, 572 (1966); accord, Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Seaman v. Commissioner, 84 T.C. 564, 588 (1985). * * *[5]

The existence of the requisite profit objective is to be determined by examining all the facts and circumstances, giving greater weight to objective facts than to the taxpayer's statement of intent. Siegel v. Commissioner, 78 T.C. 659, 699 (1982); sec. 1.183-2(a) and (b), Income Tax Regs. Section 1.183-2(b), Income Tax Regs., lists nine nonexclusive factors relevant to the issue of profit objective.[6]

---

[5]The Supreme Court also addressed the standard to be applied when it stated: "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

[6]In order to determine whether, and to what extent, sec. 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. Sec. 1.183-1(d)(1), Income Tax Regs. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings as either a single activity or separate activities. Id. Petitioners have treated their horse racing and breeding operations as one activity, and respondent has accepted this treatment.

(continued...)

Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of objective factors to be considered in deciding whether an activity is engaged in for profit. The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Allen v. Commissioner, supra at 33. No single factor is determinative. Petitioners have the burden of proving that they had the requisite profit objective and that respondent's determination is incorrect. Welch v. Helvering, 290 U.S. 111 (1933).

Businesslike Manner

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and

----

[6](...continued)

records may indicate that the activity was engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners kept books and records for their horse racing and breeding activity. Petitioners kept detailed ledgers by date and check number in which they tracked monthly expenses.

Petitioners' detailed bookkeeping does not, by itself, demonstrate an intent to generate a profit. Golanty v. Commissioner, 72 T.C. 411, 430 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). A lack of profit objective may exist where a taxpayer fails to abandon unprofitable methods, change operations, or adopt new techniques in an attempt to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs. Accordingly, the maintenance of detailed books and records may reveal the mere "trappings" of a profit objective, particularly when a taxpayer fails to produce income statements, profit plans, or business plans created to alter operations in an attempt to reverse mounting losses. Osteen v. Commissioner, T.C. Memo. 1993-519, affd. in part and revd. in part 62 F.3d 356 (11th Cir. 1995).

Petitioners contend that before conducting any racing or breeding activities, they consulted with individuals who had experience in racing horses who helped them establish a business plan. Petitioners also argue that since commencing their

activity, they have attempted to increase profitability by reducing expenses.

Although petitioners sought advice from several successful horse trainers and breeders, their testimony in this regard was vague and the meetings yielded no concrete plan of operation. Petitioners decided to commence their activity with little concept of the expenses involved or of the steps required to achieve cost efficiency and an eventual profit. See Daley v. Commissioner, T.C. Memo. 1996-259.

With respect to petitioners' assertion that they constantly analyzed and modified their business plan and operation in order to minimize expenses, petitioners have failed to introduce specific credible evidence to indicate that increased profit potential would result. The record shows that expenses over 16 years of operating their horse racing and breeding activity have generally remained constant or increased.[7] Petitioners assert that they reduced veterinary expenses between 1987 and 1990 and reduced expenses by boarding their horses at their property as part of a plan to increase profitability. The record shows a reduction of veterinary expenses in those years, but veterinary expenses for the 7 years prior and 5 years after that period have remained constant or increased as time passed. Moreover, veterinary expenses account for less than 10 percent of overall

---

[7]See appendix.

expenses in all years. Even assuming that petitioners were able to reduce their board and veterinary expenses to zero for all years, total losses would have only been reduced by approximately 40 percent. In the face of successive or increasing losses, petitioners have failed to materially alter their operations or their prospects of generating profits. Golanty v. Commissioner, supra at 428.

## Expertise

Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who possess expertise in the activity, may indicate that the taxpayer has a profit objective. Sec. 1.183-2(b)(2), Income Tax Regs.

Mr. Taras grew up on a farm and worked with horses during those years. Mr. Taras also became a member of the Pennsylvania Breeders Association and educated himself through industry publications. Petitioners sought out, consulted with, and hired professional racehorse trainers and breeders throughout the years of operation of their activity. Petitioners followed the advice of Ms. Audrey Kraynik, who represented that she was a licensed trainer experienced in training racehorses. With respect to the breeding of their horses, petitioners consulted with two horse

breeders, Mr. Tom Regal and Mr. Paul Mills.  Petitioners sought and received professional training and breeding advice.

Time Devoted to the Activity

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an intention to derive a profit.  Sec. 1.183-2(b)(3), Income Tax Regs.

Petitioners contend that they personally devoted a substantial amount of time to the activity.  Ms. Taras testified that she spent approximately 30 hours per week on projects related to the activity, including:  Bookkeeping, feeding the horses, cleaning the stalls, and exercising the horses.  Mr. Taras testified that during the years at issue, he spent approximately 39 to 45 hours per week taking care of the horses, feeding and exercising the horses, and performing routine veterinary services.

During the period in which petitioners each claim they spent a large number of hours on their horse activity, they also participated in other time-demanding activities.  Mr. Taras has owned and managed a framing and truss fabrication business in which he employed and managed between 5 and 10 persons to help him do on-site framing of homes and fabrication of trusses while he claimed to have worked approximately 40 or more hours per week on petitioners' racehorse activity.  Similarly, Ms. Taras worked

at a full-time job requiring 40 hours per week at Bethlehem, while claiming that she contributed 30 hours per week year after year in petitioners' horse activity.

Expectation That Assets May Appreciate

The appreciation of assets, including land used in the activity, is to be considered in determining whether a taxpayer intended to derive a profit from his activity. Sec. 1.183-2(b)(4), Income Tax Regs. An expectation that assets used in the activity may appreciate may be an indication of profit objective. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979).

Petitioners resided on a 1-acre parcel of land during the years in issue. Petitioners maintained their horses on a separate but adjacent 2-acre parcel of land, which was owned by Mr. Taras' parents. Because petitioners do not own the land upon which they kept their horses during the years at issue, we do not consider the land an asset that may be used in determining whether petitioners had a profit objective.

Petitioners' horses were the only assets used in the activity that might have appreciated. Petitioners argue that the quality of their horses improved over time and that on the basis of this improvement, petitioners expected to recoup their prior losses. Mr. Taras testified that each of three horses bred from the stallion Norquestor and owned by petitioners has a value of

"close to $15,000." Petitioners' net losses from their horse operation total $465,134 for all the years of operation.[8] In 1995, petitioners reported a loss from their horse activity of $57,291. At the time of trial, petitioners had sold or disposed of 25 horses and realized an overall loss of $53,205 on the sale of those horses over the course of 15 years. Of the 25 horses disposed of, petitioners realized a gain on 12 of the horses. The total gain realized on the combined sale of all 12 horses was $3,870. Of the 12 horses on which gain was reported on sale, no more than $500 of gain was reported on any single sale.[9] Even if petitioners' three most valuable horses were sold for the maximum amount that petitioners believe they are worth, it would still not offset the losses reported from their horse activity in 1995. It is, therefore, unlikely that petitioners will generate profits on the sale of their horses in the near future that would recoup more than a fraction of the past or current losses.

Past Successes in Activity

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present

---

[8]See appendix.

[9]In 1988, petitioners sold two colts which they bred for $1,000. We assume that the proceeds were allocated pro rata between the two horses sold.

activity for a profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioners have offered no evidence that before commencing their horse racing and breeding activity, they had engaged in similar activities that were profitable.

## History of Income and Losses

A taxpayer's history of income, losses, and occasional profits with respect to an activity may indicate the presence or absence of a profit objective. Golanty v. Commissioner, 72 T.C. at 426; sec. 1.183-2(b)(6), Income Tax Regs. Respondent contends that petitioners consistently incurred losses on their horse racing and breeding activity over many years, indicating that they did not have the requisite profit objective.

A horse racing and breeding activity may be deemed to be engaged in for profit despite consistent losses during the initial startup phase. Golanty v. Commissioner, supra at 427. We have previously found that the startup phase for an activity involving horses may be between 5 and 10 years. Engdahl v. Commissioner, supra at 669; Phillips v. Commissioner, T.C. Memo. 1997-128. Losses sustained beyond the period normally required to generate profits may be an indication of a lack of profit objective unless such losses occurred because of unforeseen or unfortuitous circumstances. Petitioners sustained losses on

their horse racing and breeding activity for 16 consecutive years.

Petitioners argue that their losses occurred because of unforeseen circumstances. A portion of petitioners' losses can be explained by a series of unfortunate events beyond their control. In 1983, petitioners were involved in a dispute with their first trainer, Ms. Audrey Kraynik, over the ownership of a stud horse named Distinctive Jet, which resulted in the loss of Distinctive Jet. Also, as a result of the dispute, petitioners could not register their foals from Distinctive Jet with the Jockey Club, which prevented petitioners from racing any of the foals.

Petitioners' horses sustained numerous injuries, which contributed to their losses. Some of the injuries were as follows: Liberty Knoll broke a bone in her leg, an accident which ended in her death; Talitha jumped out of a trailer while being transported; Bad Memories suffered bone chips in her knee; Captain's K developed tendon problems; Naughty Castle suffered injuries to her leg and foot; and several of petitioners' other horses suffered injuries as well. These injuries prevented petitioners from racing the injured horses.

A number of the aforementioned injuries occurred to horses which were originally purchased by petitioners in 1980. The injuries to Liberty Knoll, Captain's K, Bad Memories, and Naughty

Castle occurred in 1980 and 1981. The injury to Ruth Ann K occurred in 1983. The injuries to Traders K, Tekla Tekla Two, and Captain Konik occurred after the years in issue. We recognize that these injuries to some of petitioners' horses caused some of the losses. However, petitioners did not offer any objective evidence to explain how injuries between 1980 and 1983, and subsequent to 1990, prevented them from operating a profitable activity during the years 1987, 1988, 1989, and 1990. Indeed, despite the fact that petitioners sustained consistent losses over 16 consecutive years, they continued to engage in horse racing and breeding.

## Amount of Profits

The amount of profits earned in relation to the amount of losses incurred, the amount of the investment, and the value of the assets in use may indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. The opportunity to earn substantial profits in a highly speculative venture may be sufficient to indicate that the activity is engaged in for profit even though only losses are produced. Id.; see Dawson v. Commissioner, T.C. Memo. 1996-417. In determining whether the taxpayer entered into the activity for profit, a small chance of making a large profit may indicate the requisite profit objective. Sec. 1.183-2(b)(7), Income Tax Regs.

Petitioners may have believed that there was a possibility of producing a champion horse that could generate a substantial amount of revenue and correspondingly large profits.  However, the fact that petitioners suffered substantial losses year after year without significantly changing their method of operation in a meaningful way supports the inference that profit was not their primary reason for engaging in this activity.  Ranciato v. Commissioner, 52 F.3d 23, 26 (2d Cir. 1995), vacating and remanding T.C. Memo. 1993-536.

Taxpayers' Financial Status

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that the activity is engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  The legislative history of section 183(a) and (b) indicates a particular concern about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income.  Ranciato v. Commissioner, supra at 25-26; S. Rept. 91-552, at 95-100 (1969), 1969-3 C.B. 423, 484-487.  In this respect, the Senate report focused primarily on farming operations, including specifically the racing of horses, and noted an overall concern about taxpayers with substantial income. S. Rept. 91-552, supra at 95-98, 1969-3 C.B. at 485-486; see also Ranciato v. Commissioner, supra at 25 n.3.

On their Federal joint income tax returns, petitioners reported wage income of $26,690, $27,458, $29,576, and $31,804 in the years 1987, 1988, 1989, and 1990, respectively. Petitioners also reported on Schedules C income of $33,283, $32,261, $25,517, and $38,926 from their framing and truss fabrication business in 1987, 1988, 1989, and 1990, respectively. In each of the years at issue, the excess losses generated by petitioners' horse racing and breeding activity were used to offset their otherwise taxable income. On the other hand, petitioners were actually sustaining economic losses that were offsetting relatively modest amounts of wage and business income. On balance, this factor generally supports petitioners' position.

Personal Pleasure or Recreation

The absence of personal pleasure or recreation relating to the activity indicates the presence of a profit objective. Shane v. Commissioner, T.C. Memo. 1995-504; sec. 1.183-2(b)(9), Income Tax Regs.

Petitioners argue that they did not ride their horses or make them available for others to ride and, therefore, there were no elements of pleasure or recreation involved. While it is true that petitioners did not ride their horses, nor permit others, except qualified jockeys, to ride them, it is obvious that petitioners' racehorses were not the kind of horses that are

ridden around the farm for pleasure. The record shows that petitioners attended races at the track, watched their horses race, and also gambled on horses while they were in attendance at the races. In the final analysis, we are convinced that petitioners' enjoyment of being engaged in horse racing and breeding was the most significant reason why they continued to engage in this activity despite their record of consistent losses.

Conclusion

Having considered the factors listed in section 1.183-2(b), Income Tax Regs., all contentions presented by the parties, and the facts and circumstances of this case, we believe that petitioners honestly hoped that their horse racing and breeding activity would generate a profit and that profit was one of their objectives. However, in order to prevail, petitioners must show that their horse racing and breeding activity was engaged in primarily for the purpose of making a profit. Simon v. Commissioner, 830 F.2d at 500; Warden v. Commissioner, T.C. Memo. 1995-176, affd without published opinion 111 F.3d 139 (9th Cir. 1997).

Petitioners engaged in horse racing and breeding activities for at least 16 years, losing more than $465,000 without coming near a profit in any of those years. Petitioners initiated their activity without developing a business plan commensurate with

that which would be expected from someone who was motivated primarily by a profit objective. Throughout all the years of continuous losses, petitioners did not materially alter their mode of operation. Petitioners maintained two full-time jobs and had access to sufficient property with which they could maintain a number of racehorses that they personally enjoyed breeding and racing.

Based on the entire record, we are not convinced that petitioners' primary objective was to make a profit. Rather, the evidence is more consistent with the conclusion that petitioners enjoyed breeding and racing their horses and, therefore, were willing to sustain continuing losses despite the improbability of profits. Consequently, we hold that petitioners' horse racing and breeding activity was not primarily engaged in for profit within the meaning of section 183(c).

Respondent also determined additions to tax under section 6651(a)(1) for petitioners' failure to file their 1987 through 1990 returns. Section 6651(a)(1) imposes an addition to tax of 5 percent of the amount of the tax due for each month a return is delinquent, up to a maximum of 25 percent. The addition to tax is not applicable if it is shown that the failure is due to reasonable cause and not willful neglect. Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985). Petitioners have the burden of proving that their failure to file was due to

reasonable cause and not willful neglect.  <u>Niedringhaus v. Commissioner</u>, 99 T.C. 202, 220-221 (1992).  Petitioners filed their tax returns for the tax years 1987, 1988, and 1989 on August 23, 1991, and their tax return for the tax year 1990 on June 19, 1992.  Petitioners have failed to show that their failure to file returns for the taxable years 1987 through 1990 was due to reasonable cause and not willful neglect.  Petitioners are liable for the additions to tax under section 6651(a)(1) for the taxable years 1987 through 1990.

<u>Decision will be entered under Rule 155</u>.

*[The appendix is a 1-page spreadsheet in Lotus format that is incompatible with the Wordperfect format of this opinion.  A copy of the appendix may be obtained from chambers.]*