T.C. Summary Opinion 2008-137

UNITED STATES TAX COURT

RONALD AND SUSAN ROSENBLATT, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17002-06S.                    Filed October 30, 2008.

Elizabeth Opalka and Suzanne Meiners-Levy, for petitioners.

Jeffrey S. Luechtefeld, for respondent.

RUWE, Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pursuant to section 7463(b), the decision

_____

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined deficiencies in petitioners' Federal income taxes of $33,583 and $20,684 and section 6662 accuracy-related penalties of $6,716.60 and $4,136.80 for the taxable years 2002 and 2003, respectively. The issues for decision are:[2] (1) Whether petitioners' aircraft activity during 2002 and 2003 was engaged in for profit within the meaning of section 183; (2) whether petitioners are entitled to deductions for worthless stock and bad debts incurred in 2002; and (3) whether petitioners are liable for section 6662 accuracy-related penalties for 2002 and 2003.[3]

---

[2] Before trial, petitioners' counsel submitted to the Court a document entitled "Petitioners' Consolidated Pre-Trial Motion", which the Court treated as petitioners' pretrial memorandum. At trial, petitioners' counsel requested that the Court treat part of their pretrial memorandum as a motion for partial summary judgment (motion). The Court obliged the request but denied the motion and declined to rule on petitioners' counsel's request to shift the burden of proof. Petitioners failed to pursue some of the arguments made in their motion at trial or in their post-trial briefs. Accordingly, we deem those arguments to have been abandoned and will decide only the issues that petitioners' counsel disputed in their posttrial briefs. See Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001).

[3] Respondent also determined that petitioners' itemized deductions should be decreased by $2,534 in 2002 and $2,052 in 2003. These are computational adjustments that depend on our disposition of the other issues in this case.

## Background

Some facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. At the time of filing the petition, petitioners resided in Iowa.

Ronald Rosenblatt (petitioner) is a graduate of Columbia University with a bachelor's degree in art history, a minor in economics, and a master's of art. Petitioner also holds a Ph.D. in economics from the University of Idaho. Petitioner worked as a professor and taught economics for 7 years after he received his Ph.D.

In 2002, petitioner was employed by Principal Residential Mortgage, Inc. (PRM), a subsidiary of Principal Financial Group. Petitioner directly managed six or seven people. Indirectly, he managed approximately 500 people. Petitioner worked approximately 50 hours per week in 2002, and he spent most of his work week in the offices of PRM in downtown Des Moines. Most of petitioner's income in 2002 came from his position at PRM.

Between 2002 and 2003, PRM sold the division that petitioner managed to American Home Mortgage (AHM). In 2003, petitioner was employed by AHM as an executive vice president of sales support and development. Petitioner's work hours and responsibilities did not change very much between 2002 and 2003. Petitioner Susan Rosenblatt (Mrs. Rosenblatt) is an anchor reporter for the local

FOX news network in Des Moines, Iowa.  Petitioners reported wages on their Federal income tax returns in excess of $593,000 for 2002 and $742,000 for 2003.

Petitioner always had an interest in flying.  Petitioner had been interested in being a pilot since his youth.  In 1965, when petitioner graduated from high school, he had an appointment to the Air Force Academy, and he intended to become an Air Force pilot.  However, petitioner did not attend the Air Force Academy because his eyesight did not meet the requirements for him to train as a pilot.

Petitioners' daughter Katie received flight instruction from Executive One Aviation (EOA), beginning in 2001.  In the fall of 2001, petitioner also began taking flight training lessons from EOA.  On June 6, 2002, petitioner formed KAR RRR Aviation Leasing, LLC (KAR RRR).  Mrs. Rosenblatt purchased a one-half interest in KAR RRR on September 30, 2002.  Before Mrs. Rosenblatt became a member of KAR RRR, petitioner was the sole member, and they were the only two members thereafter.[4]  Aside from petitioners, KAR RRR had no employees.

---

[4] Petitioners apparently accounted for the aircraft activity as a sole proprietorship on a Schedule C, Profit or Loss From Business, until Mrs. Rosenblatt became a member of KAR RRR in 2002.  Thereafter, petitioners accounted for the aircraft activity as a partnership on a Schedule E, Supplemental Income and Loss.

In June 2002, KAR RRR purchased a Cessna 172 R (N3529D) aircraft (Cessna) from EOA.  Petitioner has never been a licensed pilot.  Before the Cessna was purchased, petitioner had no experience in the aviation industry other than being a "frequent flyer".  Petitioner described his decision to purchase the Cessna "as a way of having a good new plane upon which to learn, and as a way of starting a new business with the plane."

KAR RRR financed the Cessna with Cessna Finance Corp. (CFC). Petitioners paid 10 percent of the purchase price for the Cessna as a down payment, and KAR RRR financed $144,350, the balance of the purchase price for the Cessna, through CFC.  Petitioner personally guaranteed the loan from CFC to KAR RRR.  The Cessna was hangared at Ankeny Regional Airport in Ankeny, Iowa.

On May 6, 2002, before petitioner purchased the Cessna, EOA provided a written projection of net income to petitioners related to a purchase and leaseback of a Cessna.  EOA projected that if the Cessna was rented out for 700 hours per year at $95 per Hobbs hour,[5] it could potentially generate $66,500 in gross receipts.[6]  After subtracting expenses for insurance, hangar, fuel, maintenance, engine reserve, and management fees totaling

---

[5] A Hobbs meter is a device used to measure the amount of time an aircraft is in operation.

[6] Petitioners had actual gross receipts from the aircraft activity of $21,645 in 2002 and $31,865 in 2003.

$44,725, EOA projected a net income of $21,775 on a leaseback by EOA of the Cessna.  Petitioner did not produce any other formal business plan for KAR RRR.[7]

EOA's projection did not include finance expenses, commissions, legal and professional services expenses, or depreciation.  Reported expenses for petitioners' 2002 and 2003 aircraft activity were as follows:

2002 Expenses

| Deductions | Schedule C | Schedule E | Total |
|---|---|---|---|
| Repairs and maintenance | $1,210 | $2,146 | $3,356 |
| Interest | 1,777 | 1,777 | 3,554 |
| Depreciation (and sec. 179) | 73,447 | 5,924 | 79,371 |
| Commissions (and fees) | 1,595 | 1,160 | 2,755 |
| Fuel | 3,513 | 2,385 | 5,898 |
| Hangar | 375 | 375 | 750 |
| Insurance | 2,495 | 2,709 | 5,204 |
| Miscellaneous | -- | 39 | 39 |
| Legal and professional services | 3,100 | -- | 3,100 |
| Management fees | 2,087 | -- | 2,087 |
| Total | 89,599 | 16,515 | 106,114 |

---

[7] Petitioner testified that he "worked off * * * [a] pro forma and * * * [his] own notes about marketing and so on" and that those materials indicated that, "given a certain number of hours per month of * * * lease that it would be profitable." Petitioner's "pro forma" and marketing notes were not offered into evidence.

2003 Expenses

| Deductions | Schedule E |
|---|---|
| Repairs and maintenance | $8,739 |
| Interest | 5,942 |
| Depreciation (and sec. 179) | 35,882 |
| Commissions (and fees) | 4,282 |
| Fuel | 6,203 |
| Hangar | 1,500 |
| Insurance | 10,762 |
| Miscellaneous | 906 |
| Legal and professional services | 1,500 |
| Instruction | 591 |
| Total | 76,307 |

On June 14, 2002, KAR RRR, CFC, and EOA entered into a "Consent to Lease Agreement" (lease agreement), related to the Cessna. CFC required the lease agreement as a condition precedent to obtaining financing on the Cessna because the Cessna would be rented out to the general public. Under the lease agreement, KAR RRR was designated the "Lessor" and EOA was designated the "Lessee". The lease agreement stated in pertinent part: "Neither Lessor [KAR RRR] nor Lessee [EOA] shall further lease the * * * [Cessna] or assign the Lease without first obtaining the prior written consent of CFC, which consent may be withheld at the sole discretion of CFC."

KAR RRR and EOA also entered into an "Aircraft Marketing Agreement" (marketing agreement), drafted by Advocate Consulting, which stated as follows:

AIRCRAFT MARKETING AGREEMENT
This agreement, made on this 14th day of June, 2002 by and between KAR RRR Aviation Leasing, LLC., hereinafter

referred to as the Owner, and * * * [EOA], hereinafter referred to as the Agent.

WITNESSETH

WHEREAS, Owner is the owner of one (1) Cessna 172R, Registration Number N3529D;

WHEREAS, Agent in the ordinary course of business develops relationships with prospective customers for owner seeking to rent aircraft;

WHEREAS, Agent is willing to serve as marketing and compliance agent on a non-exclusive basis upon the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows;

     1) Aircraft:  Owner hereby authorizes Agent to serve as a nonexclusive marketer for the aircraft outlined on Exhibit A.

     2) Terms of Agreement:  The term of this agreement shall be for a period of seven (7) days commencing on the date hereof, and automatically renew each seven (7) days thereafter.  This agreement shall be subject to termination by either the Owner or Agent for any reason whatsoever upon five (5) days advance written notice given to the other party.

     3) The aircraft will be based at the Ankeny Airport, and the owner will assume all responsibility for storage fees in the amount of $125.– per month for heated, community hangar space.

     4) Owner has had the aircraft inspected by * * * [EOA], verifying that the aircraft meets the standards required by the Federal Aviation Regulations and that a valid Airworthiness Certificate exists in respect thereto, and that all other requirements and paperwork are in good order and effect.

     5) The fees payable by Owner to Agent for the rental of said aircraft shall be calculated at the rate of 15% of the gross Hobbs rental charge.  At the start of this agreement, said hourly rate shall be $90.00,

and may be adjusted with approval of both parties. The rent shall be paid within ten days after the end of each calendar month, based upon the hours rented during each prior month. Agent agrees to waive charges for the use of the aircraft by Owner. Owner agrees to follow scheduling procedures established by Agent for the reservations of aircraft and to return aircraft with full fuel to the Agent.

6) Owner shall maintain the aircraft to satisfactorily retain its airworthiness certificate thereby meeting the requirements of the Federal Aviation Administration.

7) Owner shall furnish at their own expense all fuel, oil, lubricants and other materials necessary for the operation of said aircraft. Fuel shall be priced by Agent to Owner at the leaseback rate of twenty (20) cents below the then current retail rate. In addition all shop labor shall be priced at $5 per hour below current list and parts shall be charged at 15% above cost, plus freight or other added charges. All required & routine maintenance may be performed by the * * * [EOA] maintenance facility without prior notice to Owner.

8) Renters shall be required at a minimum to have 12 hours total time plus a sign-off from an FAA Approved Current Flight Instructor in order to solo this aircraft. Other than for maintenance down time, this aircraft shall be available for scheduled rent at all times.

9) Owner shall provide and keep insurance in full force and effect, at their own expense. Such insurance shall be written by an underwriter satisfactory to all parties and naming the Owner, Agent and Current Lienholder as insured, and shall protect the interests of the Owner, Agent and Current Lienholder. If the risk is covered by the insurance policy of the Agent, the Owner shall prepay Agent the amount of such insurance at the first of each calendar month and Agent shall provide Owner evidence of such Insurance coverage in force and satisfactory to the Owner and Current Lien holder. Agent shall be responsible for deductible if the aircraft is damaged while hangared at * * * [EOA], if such damage is caused by an * * * [EOA] employee or by a customer renting the aircraft through * * * [EOA].

10) The term of this agreement shall be 5 years, commencing on the below mentioned execution date. Owner may terminate this agreement for any reason upon thirty (30) days written notice to Agent.

Petitioner provided documents (logs) indicating his involvement with KAR RRR during 2002 and 2003. These logs show that petitioner spent approximately 197.05[8] and 208.25 hours on KAR RRR activities in 2002 and 2003, respectively.[9] Petitioner prepared these logs himself, though he admits they are incomplete. Much of the time reflected in petitioner's logs represents time during which he participated in flight instruction, ground school, and test flights.

Petitioners relied on the services of EOA for taking reservations for the Cessna, providing storage for the Cessna, and providing licensed flight instructors to fly the Cessna. The customers who rented the Cessna did not enter into written lease agreements, but they did sign a document ensuring that the people who flew the Cessna were licensed pilots. These agreements were maintained by EOA. The people who flew the Cessna included both flight instruction students and private pilots. KAR RRR's Cessna

---

[8] The total time on petitioner's log for 2002 is listed as 191.3 hours but actually adds up to 197.05 hours.

[9] The logs separate petitioner's "Business Time" and "Travel Time" spent on KAR RRR. In 2002, petitioner's log reflects 52.75 hours of travel time and 144.3 hours of business time. In 2003, petitioner's log reflects 41 hours of travel time and 167.25 hours of business time.

was one of three or four aircraft available to rent at the Ankeny Regional Airport in 2002 and 2003.

Benefit Technologies, Inc. (BTI), is a research and development business specializing in full flexible benefit plans for small to midsize companies. Andrew Hyman (Mr. Hyman) was the founder of BTI and is still actively involved with BTI. BTI filed for chapter 7 bankruptcy protection in February 2001, shortly after BTI defaulted on a $250,000 interest payment to a venture capital firm on January 15, 2001. Sometime after filing for bankruptcy, BTI's bankruptcy proceedings were converted from chapter 7 to chapter 11.

Petitioner owned BTI stock, lent money to BTI, and served on BTI's board of directors, but petitioner was not an employee of BTI. Petitioner was never actively involved in BTI, other than having attended occasional board meetings. Petitioners claimed losses of $432,346 in 2002 relating to the alleged worthlessness of their BTI stock and loans that petitioner made to BTI.

## Discussion

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

I.   <u>Claimed Losses From Aircraft Activity</u>

Pursuant to section 183(b), deductions with respect to an activity "not engaged in for profit" generally are limited to the amount of gross income derived from such activity.  Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

Deductions are allowed under section 162 for the ordinary and necessary expenses of carrying on an activity which constitutes the taxpayer's trade or business.  Deductions are allowed under section 212 for expenses paid or incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income.  With respect to either section, however, the taxpayer must demonstrate a profit objective for the activities in order to deduct associated expenses.  <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); <u>Warden v. Commissioner</u>, T.C. Memo. 1995-176, affd. without published opinion 111 F.3d 139 (9th Cir. 1997); sec. 1.183-2(a), Income Tax Regs.  In order to meet the required profit objective, "the taxpayer's primary purpose for engaging in the activity must be for income or profit."  <u>Commissioner v.</u>

Groetzinger, 480 U.S. 23, 35 (1987); Bot v. Commissioner, 353 F.3d 595, 599 (8th Cir. 2003), affg. 118 T.C. 138 (2002); Am. Acad. of Family Physicians v. United States, 91 F.3d 1155, 1157-1158 (8th Cir. 1996).

Section 1.183-2(b), Income Tax Regs., provides factors to be considered when determining whether an activity is engaged in for profit as follows:

> (b). Relevant factors.--In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. * * *

Nine nonexclusive factors are set forth in the regulations which are to be considered when determining profit intent. Those factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether

elements of personal pleasure or recreation exist.  Id.  Not all of the factors are applicable in every case, and no one factor is controlling.  See Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.  We begin by applying each of these factors to the facts relating to petitioners' aircraft activity.

The fact that a taxpayer carries on an activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity was engaged in for profit. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(b)(1), Income Tax Regs.  During the years at issue, petitioner kept logs noting his involvement with KAR RRR, but he admitted that those logs were incomplete.  The logs were not made contemporaneously with the activities petitioner noted therein. Much of the time memorialized in the logs is attributable to travel time and time that petitioner spent on his own flight training activities and classes.

Petitioner failed to develop a formal business plan. Although petitioner testified that he used a "pro forma", it was not produced at trial.  EOA's financial projections overestimated the profitability of renting the Cessna, and the projected expenses did not include finance expenses, sales tax, or registration fees and did not take into account actual depreciation of the Cessna.

Petitioner testified that he was active in advertising the Cessna throughout the community, but he failed to adequately corroborate that testimony with evidence of such marketing activities. Petitioner also did bookkeeping for KAR RRR, including the establishment and maintenance of the company bank account. However, petitioners relied on the services of EOA for the day-to-day rental of the Cessna, including taking reservations for the Cessna, providing storage for the Cessna, and providing licensed flight instructors to fly the Cessna. Moreover, the maintenance, rental of the aircraft, and collection of rental receipts were performed by either EOA or the flight instructors associated with the rental flights. Petitioner explained at trial that student pilots and renters would pay EOA directly for the use of the Cessna at the end of the rental period. EOA would then credit the account of KAR RRR for the fee generated. At the end of the month, EOA would deduct their commission and other expenses, such as fuel and maintenance. Petitioner was not qualified to perform the maintenance on the Cessna necessary to keep it airworthy. Petitioner reviewed some of these activities but did not perform them himself and otherwise had limited involvement in the day-to-day activities involving the Cessna. Consequently, consideration of the first factor weighs against the finding of a profit objective.

A taxpayer's expertise or that of his advisers is a factor in determining profitability. Sec. 1.183-2(b)(2), Income Tax Regs. Before his purchase of the Cessna, petitioner had no relevant experience in the aircraft industry. Petitioner spent time "going on the FAA's website" to understand what rules and regulations governed private aviation. He also researched Cessna's advisories about his type of aircraft to determine "whether there were recalls or anything like that."

Petitioner sought advice in selecting the appropriate aircraft for the activity, relying in part on the knowledge of local flight instructors. Otherwise, petitioner relied on EOA, the seller of the Cessna, and Advocate Consulting. Before the purchase of the Cessna, petitioner was informed by EOA's president that the Cessna could be rapidly depreciated for tax purposes. At the same time, employees of EOA informed petitioner that Advocate Consulting could structure the purchase of the Cessna in a tax-advantageous manner. Petitioner's independent research on Advocate Consulting entailed going online and trying "to get a little background on the * * * company." Petitioner did not know anyone else who was referred to Advocate Consulting. Petitioner testified that Advocate Consulting agreed to represent petitioners before the IRS as part of their agreement with KAR RRR.

Petitioners retained the services of Advocate Consulting on a yearly basis. Petitioners sought the advice of Advocate Consulting because aircraft leasing "was a field that * * * [petitioner] really didn't know in terms of legal or tax issues." When asked at trial if he ever thought that the tax advice he received was too good to be true, petitioner responded that if he's "paying for their advice and their counsel tells me that this is the way it is, then * * * I believe them."

As we have already noted, EOA provided a written projection of net income that did not include finance expenses, commissions, legal and professional services expenses, or tax depreciation expenses related to the Cessna. Given petitioner's educational background in economics and his discussions with employees of EOA and Advocate Consulting about structuring the purchase of the Cessna in a tax-advantageous manner, it is reasonable to assume that petitioner recognized the significant distortions these omissions would create between the projected profits and the profits or losses from the aircraft activity that petitioners would report on their tax returns. In preparing for an activity, a taxpayer need not make a formal market study, but might be expected to undertake a basic investigation of the factors that would affect profit. Westbrook v. Commissioner, T.C. Memo. 1993-634, affd. 68 F.3d 868 (5th Cir. 1995). Yet petitioner failed to seek an objective opinion about the profit potential of such an

undertaking and relied heavily on parties with their own subjective interest in the transaction. Under the circumstances, petitioner's independent research of profitability of the aircraft activity was insufficient. Consequently, the second factor weighs against a finding of a profit objective.

The fact that a taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if there are no substantial personal or recreational elements, may indicate a profit motive. Sec. 1.183-2(b)(3), Income Tax Regs. Much of the time that petitioner spent on the aircraft activity involved his own flying lessons. Petitioner and his daughter had decided to learn how to fly, and petitioner purchased the Cessna as a way to do that. Petitioner had long wanted to learn to fly airplanes, having attempted to join the Air Force when he was younger. Petitioner created logs documenting his activities related to the Cessna. The logs, though incomplete, indicate that petitioner spent approximately 197.05 and 208.25 hours on KAR RRR activities in 2002 and 2003, respectively. Much of that time represents petitioner's own flying instruction. While the logs petitioner kept indicate some activity that could be construed as business related, it could also be construed as a genuine interest in a recreational activity. Regardless, the relatively small amount of time spent on this activity that was substantiated in the record does not outweigh the evidence indicating that petitioner

had a significant interest in the recreational elements of the activity. Consequently, the third factor does not support a finding of a profit objective.

An expectation that the assets used in the activity will appreciate in value might indicate a profit objective. Sec. 1.183-2(b)(4), Income Tax Regs. It is unlikely that petitioner expected the Cessna, the only asset owned by KAR RRR, to appreciate in value. Additionally, absent extenuating circumstances, none of which were established in this case, the regular wear and tear on a Cessna would likely cause economic depreciation. Accordingly, the fourth factor weighs against finding a profit objective.

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs. Petitioner had no previous experience in the aircraft industry, and provided no evidence that he had engaged in any similar activities for profit. Consequently, the fifth factor is neutral.

A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, where losses continue to be sustained beyond the

period that customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. Id. Ultimately, a taxpayer must demonstrate an ability to make a profit in the long term to offset any startup losses. See Bessenyey v. Commissioner, 45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

There was no prior history of either profits or losses from petitioner's aircraft activity because the years at issue were the first 2 years in which petitioner's aircraft activity existed. In neither 2002 nor 2003 did the aircraft activity generate a profit.[10] Petitioner testified and submitted evidence indicating that in the years following the years at issue, several flight instructors who had used petitioner's Cessna to give lessons decided to start their own flight instruction business using petitioner's Cessna at Des Moines International Airport. Petitioner explained that he became very involved in the marketing and organization of this new business and had plans to merge his aircraft activity with the flight instructors' business. However, petitioner failed to submit evidence regarding the profitability of the aircraft activity in the years

---

[10] The aircraft activity generated losses of $84,469 for 2002 and $44,442 for 2003.

after 2003.  Without any proof of profitability in later years, the sixth factor is neutral.

The amount of occasional profits earned in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent.  Sec. 1.183-2(b)(7), Income Tax Regs.  As we have established, there is no history of the aircraft activity's being profitable.  Consequently, the seventh factor is neutral.

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit, especially if there are personal or recreational elements involved.  Sec. 1.183-2(b)(8), Income Tax Regs.  Petitioner worked approximately 50 hours per week in 2002, and he spent most of his work week in the offices of PRM in downtown Des Moines.  Most of petitioner's income came from his position at PRM.  Petitioner's hours and responsibilities did not change very much between 2002 and 2003.  Petitioners reported salaries in excess of $593,000 in 2002 and $742,000 in 2003.  The losses created by the aircraft activity, if found to be deductible, would offset some of petitioners' substantial salaries and generate a significant tax savings in the years at issue.  Consequently, the eighth factor weighs against a profit objective.

Finally, the presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for

profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioners' daughter Katie received flight instruction from EOA beginning in 2001. In the fall of 2001, petitioner also began taking flight training lessons from EOA. Before taking flying lessons, petitioner always had an interest in flying. Being a pilot had been a long-term interest of petitioner since his youth. Petitioner acknowledges the purchase of the Cessna as "a way of having a good new plane upon which to learn". Consequently, the ninth factor weighs against a finding of a profit objective.

When considering whether a taxpayer engaged in an activity for profit, greater weight must be given to the objective facts than to a taxpayer's mere statement of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985). While some of petitioner's efforts could support an argument in favor of a profit objective, they could also be construed as a genuine interest in and an effort to contribute to an activity that provided personal pleasure in the form of a hobby. Regardless, petitioner's testimony and the evidence on record in favor of petitioners' argument are insufficient to overcome the weight of the objective facts indicating that petitioners were not engaging

in the activity primarily for profit.[11]  Accordingly, we will sustain respondent's determination with regard to the disallowance of losses created by the aircraft activity.

II.  Claimed Loss from Worthless Stock and Loans

On their 2002 Federal income tax return, petitioners claimed losses of $432,346 relating to the alleged worthlessness of their BTI stock and loans petitioner made to BTI.  On petitioners' 2002 Schedule D, Capital Gains and Losses, they reported a short-term capital loss of $332,346 related to BTI, which contributed to a total net short-term loss of $412,033 reported for that year. Petitioners also reported a $100,000 long-term capital loss related to BTI on their Schedule D for 2002, which contributed to a total net long-term capital loss of $26,245.  Petitioners were limited by section 1211(b)(1) to a recognized capital loss of $3,000 on their 2002 Federal income tax return.  Petitioners carried forward a short-term capital loss of $409,033 and a long-term capital loss of $26,245 to 2003.

Respondent disallowed petitioners' claimed capital losses relating to BTI.  However, respondent concedes that after application of the section 1211(b)(1) capital loss limitation in 2002, petitioners' Federal income tax return for 2002 reflected

_____

[11] Because we find that petitioners' aircraft activity was not engaged in with the required profit objective, we need not decide whether petitioners' losses were nondeductible passive activity losses subject to the limitations imposed under sec. 469.

the appropriate amount of capital losses (i.e., capital loss of $3,000).  Accordingly, the disallowance of the reported loss with respect to BTI affects only petitioners' taxable income for 2003.

Petitioners argue that the BTI stock became worthless and that their loans to BTI became nonbusiness bad debt when BTI "ran out of opportunities to sell the company" in 2002.  Respondent argues that neither the stock nor the loans became worthless in 2002.

In order for a taxpayer to claim a loss for worthless securities in a taxable year, the security must become worthless in that taxable year.  Sec. 165(g)(1).  A loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year.  Sec. 1.165-1(d)(1), Income Tax Regs.  Total worthlessness of the security is required for the deduction.  Sec. 1.165-4, Income Tax Regs.  No loss deduction is allowed for partial worthlessness or for mere decline in value.  Sec. 1.165-5, Income Tax Regs.  Stock becomes worthless and the loss is sustained only when the stock has no liquidating value and there is no reasonable hope and expectation that at some future point in time it will become valuable. Duncan v. Commissioner, T.C. Memo. 1986-122.  The burden is on the taxpayer to establish the worthlessness of the stock and the year in which it became worthless.  Id. (citing Boehm v.

Commissioner, 326 U.S. 287, 292 (1945)). The loss can be established satisfactorily only by some "identifiable event" in the corporation's life which extinguishes all hope and expectation of revitalization, such as bankruptcy, cessation of business operations, liquidation of the corporation, or appointment of a receiver for it. Morton v. Commissioner, 38 B.T.A. 1270, 1279 (1938), affd. 112 F.2d 320 (7th Cir. 1940).

In the case of a taxpayer other than a corporation, where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. Sec. 166(d)(1)(B). A loss on a nonbusiness debt is treated as sustained only if and when the debt has become totally worthless. Sec. 1.166-5(a)(2), Income Tax Regs. The burden is on the taxpayer to establish the worthlessness of the debt and the year in which it became worthless. Crown v. Commissioner, 77 T.C. 582, 598 (1981). It is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning hope of recovery. Id.

Whether petitioner's loans made to BTI should be evaluated for fitting the definition of worthless securities or nonbusiness bad debt depends on whether the debt is evidenced by a security

as defined in section 165(g)(2)(C).[12]  Sec. 166(e).  However,
each of these alternatives requires petitioners to show that, at
the end of 2002, there was no reasonable prospect for recovery.
See Boulafendis v. Commissioner, T.C. Memo. 1984-321 (citing
Boehm v. Commissioner, supra at 291-292; Crown v. Commissioner,
supra at 598).  Accordingly, we begin our analysis by addressing
this issue.

Mr. Hyman testified that BTI owned furniture, fixtures, and
a patent on the use of linear programming at the time it filed
for bankruptcy in 2001.  He testified that BTI had substantial
value at that time.  Almost immediately after the bankruptcy
filing, the venture capital firm on whose interest payment BTI
defaulted and another company submitted separate bids to purchase
the assets of BTI for $2 million.  Mr. Hyman testified that if a
sale had occurred in 2001, BTI shareholders would have benefited.
However, Mr. Hyman believed that BTI could be sold for, and the
assets were worth, significantly more than $2 million.  According
to Mr. Hyman, that is the reason that BTI's bankruptcy trustee
turned down both of the $2 million offers.

Mr. Hyman testified that it was reasonable for petitioner to
believe that he could get something for his investment in BTI at

---

[12] Sec. 165(g)(2)(C) defines a "security" as "a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form."

the end of 2001, even after it filed for bankruptcy.  At that time, Mr. Hyman was hopeful that a sale was going to occur.  Mr. Hyman testified that, when no sale occurred, the company was "put into cold storage" with the goal of trying to raise money.  BTI's bankruptcy proceeding was later converted from chapter 7 to chapter 11.  BTI is presently operating as a business in chapter 11, and Mr. Hyman testified that "there's activity now starting to try to raise capital within the chapter 11 environment to be able to, to bring the company potentially out of chapter 11 and operate * * * the company."

The evidence presented at trial, combined with Mr. Hyman's testimony, indicates that BTI had value at all times in 2002 and still has value.  Petitioners have failed to carry their burden of proof to show that there was no reasonable prospect of recovery for their stock and loans in 2002.  Accordingly, we hold that petitioners are not entitled to deductions for worthless securities or nonbusiness bad debt.

III.  Accuracy-Related Penalty

With respect to the accuracy-related penalty under section 6662(a), the Commissioner has the burden of production.  Sec. 7491(c).  To prevail, the Commissioner must produce sufficient evidence that it is appropriate to apply the penalty to the taxpayer.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his burden of production, the

taxpayer bears the burden of supplying sufficient evidence to persuade the Court that the Commissioner's determination is incorrect.  Id. at 447.

Section 6662(a) and (b)(1) provides accuracy-related penalties equal to 20 percent of the underpayment of tax required to be shown on a return if the underpayment is due to negligence or disregard of rules or regulations.[13]  For purposes of section 6662, the term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions of * * * [the Code], and the term 'disregard' includes any careless, reckless, or intentional disregard."  Sec. 6662(c).  "Negligence" also includes any failure by a taxpayer to keep adequate books and records or to substantiate items properly.  Sec. 1.6662-3(b)(1), Income Tax Regs.

An accuracy-related penalty is not imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith.  Sec. 6664(c)(1); see Higbee v. Commissioner, supra at 448.  This determination is made based on all the relevant facts and circumstances.  Higbee v. Commissioner, supra at 448; sec. 1.6664-4(b)(1), Income Tax Regs.

---

[13] Sec. 6662 can also apply when there is a substantial understatement of tax.  See sec. 6662(b)(2).  However, since the only reason given in the notice of deficiency for imposing the penalty was negligence or intentional disregard of rules and regulations, and respondent did not raise sec. 6662(b)(2) until after trial, we will only consider the issue raised in the notice of deficiency.

Relevant factors include the taxpayer's efforts to assess his proper tax liability.

While we have held that petitioners did not have profit as their primary objective for entering into the aircraft activity, we believe that they had both personal and profit objectives in the sense that they actually hoped that their activity might produce a profit. See Warden v. Commissioner, T.C. Memo. 1995-176. Sometimes it is difficult to determine which of two motives for engaging in an activity is primary. That is one of the basic reasons for using objective facts to determine subjective intent. But a finding that profit was not the primary motive does not automatically result in a conclusion that petitioners were negligent or intentionally disregarded the rules and regulations. See Bernardo v. Commissioner, T.C. Memo. 2004-199; Sherman v. Commissioner, T.C. Memo. 1989-269. On the basis of the previously stated facts, we find that petitioners' reporting of their aircraft activity was not due to negligence and that they are not liable for the penalties with respect to the portions of the underpayments due to their aircraft activity. Likewise, we find that petitioners are not liable for the penalty on the portion of the 2003 underpayment due to their claimed losses from worthless stock and loans. The determination of worthlessness in the situation described in this case is not without some doubt, and while we have found that petitioners have not proven

worthlessness, we believe that they honestly believed that their stock and loans were worthless in 2002.[14] We therefore hold that petitioners are not liable for the section 6662 penalties.

To reflect the foregoing,

<u>Decision will be entered for respondent as to the deficiencies and for petitioners as to the accuracy-related penalties</u>.

---

[14] In petitioners' posttrial brief, they requested the following finding of fact:

> 62. Dr. Rosenblatt believes his investments in Benefit Technologies became worthless in 2002 because during that year the bankruptcy trustee ran out of opportunities to the [sic] sell the company.

In his answering brief, respondent had no objection to this proposed finding of fact.